# EXHIBIT 1

20STCV34067

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Lia Martin

Electronically FILED by Superior Court of California, County of Los Angeles on 09/08/2020 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Barel,Deputy Clerk

1   Jonathan A. Stieglitz, Esq. (SBN 278028)
    THE LAW OFFICES OF JONATHAN A. STIEGLITZ
2   11845 Olympic Blvd., Suite 800
    Los Angeles, CA 90064
3   Telephone:    (323) 979-2063
    Facsimile:    (323) 488-6748
4
    Attorney for Plaintiff
5   Healthcare Ally Management of California, LLC

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

11   HEALTHCARE ALLY MANAGEMENT          Case No.: 20STCV34067
     OF CALIFORNIA, LLC
12                                       Complaint For:
                    Plaintiff,           1.  BREACH OF ORAL CONTRACT; and
13                                       2.  PROMISSORY ESTOPPEL
             v.
14
     SBE ENT Holdings, LLC and DOES 1-10
15
                    Defendant.           (Jury Trial Requested)
16

17

18

19
            Plaintiff HEALTHCARE ALLY MANAGEMENT OF CALIFORNIA, LLC (hereinafter
20
     referred to as "HAMOC") complains and alleges:
21
                                    STANDING
22
            1.      On June 17, 2015, La Peer Surgery Center (hereinafter referred to as the "Medical
23
     Provider") entered into an agreement with HAMOC. The agreement provided that Medical
24
     Provider could assign any past, present or future unpaid or underpaid bills to HAMOC by sending
25
     HAMOC a copy of the unpaid or underpaid bill. The agreement also provided that once an
26
     underpaid or unpaid bill was assigned to HAMOC, HAMOC had the right to take any legal action
27
     necessary including the filing of a lawsuit to attempt to recover an unpaid or underpaid bill. On
28

                                         - 1 -
                                        Complaint

1    May 29, 2019, Medical Provider assigned Patients'[1] underpaid/unpaid bill including the right to

2    file a lawsuit to HAMOC by sending via email a copy Patients' underpaid/unpaid bill to

3    HAMOC. Patient is a member and enrollee of the SBE ENT Holdings, LLC's (hereinafter

4    referred to as "DEFENDANT") health insurance policy.

5                                          **PARTIES**

6        2.      DEFENDANT is and was licensed to do business in and is and was doing business

7    in the State of California, as a payor of insurance. HAMOC is informed and believes that

8    DEFENDANT and or its agents are licensed to transact the business of insurance in the State of

9    California.  DEFENDANT and or its agents are in fact transacting the business of insurance in the

10   State of California and is thereby subject to the laws and regulations of the State of California.

11       3.      The true names and capacities, whether individual, corporate, associate, or

12   otherwise, of defendants DOES 1 through 10, inclusive, are unknown to HAMOC, who therefore

13   sues said defendants by such fictitious names.  HAMOC is informed and believes and thereon

14   alleges that each of the defendants designated herein as a DOE is legally responsible in some

15   manner for the events and happenings referred to herein and legally caused injury and damages

16   proximately thereby to HAMOC.  HAMOC will seek leave of this Court to amend this Complaint

17   to insert their true names and capacities in place and instead of the fictitious names when they

18   become known to it.

19       4.      At all times herein mentioned, unless otherwise indicated, DEFENDANT/s were

20   the agents and/or employees of each of the remaining defendants, and were at all times acting

21   within the purpose and scope of said agency and employment, and each defendant has ratified and

22   approved the acts of his agent.  At all times herein mentioned, DEFENDANT/s had actual or

23   ostensible authority to act on each other's behalf in certifying or authorizing the provision of

24   services; processing and administering the claims and appeals; pricing the claims; approving or

25   denying the claims; directing each other as to whether and/or how to pay claims; issuing

26

27   _____
28   [1] For privacy reasons and in order to comply with Health Insurance Portability and Accountability
     Act ("HIPAA"), the full names, dates of treatment and policy information pertaining to the
     Patients is being withheld.  This information will be disclosed to defendants upon their request.

- 2 -

Complaint

remittance advices and explanations of benefits statements; making payments to Medical Provider and its Patient.

**GENERAL FACTS**

5.    All of the claims asserted in this complaint are based upon the individual and proper rights of HAMOC in its own individual capacity and are not derivative of the contractual or other rights of the Medical Provider's Patient.  All of the claims asserted in this complaint arise out of the Medical Provider's interactions with DEFENDANT and DOES 1 through 10, inclusive and are derived from the representations and warranties made during those conversations amongst those parties. HAMOC does not in any way, seek to enforce the contractual rights of the Medical Provider's Patient, through the Patient's insurance contract, policies, certificates of coverage or other written insurance agreements.

6.    This complaint arises out of the failure of DEFENDANT to make proper payments and/or the underpayment to Medical Provider by DEFENDANT and DOES 1 through 10, inclusive, of amounts due and owing now to HAMOC for use of facilities at which surgical care, treatment and procedures were provided to Patient, who were insureds, members, policyholders, certificate-holders or were otherwise covered for health, hospitalization and major medical insurance through policies or certificates of insurance issued and underwritten by DEFENDANT and DOES 1 through 10, inclusive.

7.    HAMOC is and was informed based on DEFENDANT's oral and other representations that the Patient were insureds of DEFENDANT either as subscribers to coverage or dependents of a subscriber to coverage under a policy or certificate of insurance issued and underwritten by DEFENDANT and or its agents.  HAMOC is and was informed that the Patient entered into a valid insurance agreement with DEFENDANT and or its agents for the specific purpose of ensuring that the Patient would have access to medically necessary treatments, care, procedures and surgeries at medical facilities like Medical Provider and ensuring that DEFENDANT would pay for the health care expenses incurred by the Patient.

- 3 -
Complaint

8.   HAMOC is and was informed that DEFENDANT and or its agents received and continue to receive, valuable premium payments from the Patient and/or other consideration from the Patient under the subject policies applicable to the Patient.

9.   Medical Provider and the doctors who performed surgeries or procedures upon the Patient were "out-of-network providers" or "non-participating providers" who had no preferred provider contracts or other such standing, written contracts with DEFENDANT setting their rates of pay for services rendered, prior to the date that the surgeries or procedures were performed upon the Patient.

10.   It is standard practice in the health care industry that when a medical provider enters into a written preferred provider contract with a health plan such as DEFENDANT, that a medical provider agrees to accept reimbursement that is discounted from the medical provider's total billed charges in exchange for the benefits of being a preferred or contracted provider.

11.   Those benefits include an increased volume of business, because the health plan provides financial and other incentives to its members to receive their medical care and treatments from the contracted provider, such as advertising that the provider is "in network", and allowing the members to pay lower co-payments and deductibles to obtain care and treatment from a contracted provider.

12.   Conversely, when a medical provider, such as Medical Provider, does not have a written contract or preferred provider agreement with a health plan, the medical provider receives no referrals from the health plan, but, rather, the health plan discourages its members and subscribers from obtaining their care from the non-contracted or non-participating providers.

13.   The medical provider has no obligation to reduce its charges. The health plan is not entitled to a discount from the medical provider's total bill charge for the services rendered, because it is not providing the medical provider with in network medical provider benefits, such as increased patient volume and direct payment obligations.

14.   The reason why medical providers have chosen to forgo the benefits of a contract with a payor is that, in recent years, many insurers including DEFENDANT and or its agent's contracted rates for in-network providers have been so meager, one-sided and onerous, that many

- 4 -

Complaint

1    providers like Medical Provider have determined that they cannot afford to enter into such

2    contracts.  As a result, a growing number of medical providers have become non-contracted or

3    out of network providers.

4        15.      Since no other relationship exists between out of network providers and

5    payors/insurers, to properly determine whether or not to provide medical services to a patient, the

6    common practice of out of network medical providers is to obtain a separate oral promise and

7    assurance of payment from the payor or its administrator/agent. In the instance where the terms of

8    payment are unsatisfactory a medical provider will make other arrangements with the patient or

9    tell the patient if they cannot follow through on the other arrangements to seek services

10   somewhere else.

11       16.      Payors and insurers want their patients to be seen and so they commonly promise

12   to pay a percentage of the market rate for the procedure, also described as, an average payment

13   for this procedure or use of facility performed or provided by similarly situated medical providers

14   within similarly situated areas or places of practice. Rather than use the words market rate to

15   simplify terms, payors have long used words or combinations of words such as usual, reasonable,

16   customary ("UCR") and allowed.

17       17.      UCR is a well-known term of art in the health care industry for payment of

18   medical claims. The Federal Government provides the commonly utilized definition for UCR.

19   "The amount paid for a medical service in a geographic area based on what providers in the area

20   usually charge for the same or similar medical service. The UCR amount sometimes is used to

21   determine the allowed amount."[2]

22       18.      To give a specific dollar amount, DEFENDANT, its agents, and other payors of

23   insurance commonly utilize a publicly available database of information called Fair Health to

24   calculate in dollars and cents what would be considered UCR. "If a health care benefit plan

25   requires payment using the term "reasonable and customary" or similar language mentioned

26   above with respect to medical and surgical procedures performed and billed by health care

27

28       [2] Healthcare.gov, UCR (Usual, Customary and Reasonable) (April 30, 2018),
         https://www.healthcare.gov/glossary/UCR-usual-customary-and-reasonable/ [defining UCR].

Complaint

professionals or health care professional group practices, then the affiliates of UnitedHealth Group most commonly refer to a schedule of charges created by FAIR Health, Inc. ("FAIR Health") to determine the amount of the payment."[3]

19.    Medical Provider and its affiliated physicians have a reputation for providing high quality care.  Its charges for its facilities and services are on par with the average charges of other medical providers in the same general area for the same facilities and/or services.

## SPECIFIC FACTS
## PATIENT IR

20.    On May 9, 2019, Patient received surgical procedures using Medical Provider's facility.

21.    On May 1, 2019, for each respective procedure, Medical Provider's employee, Linda R., obtained promises and information from DEFENDANT's representatives, Frances, L., to be assured that DEFENDANT would pay for the facilities to be provided to Patient and under what terms that payment would be made.

22.    Medical Provider was informed that Patient's deductible is and was $3,000.00 and that Patient's Max Out Of Pocket ("MOOP") expense is and was $6,000.00 and that to date for that calendar year Patient had paid $3,540.00.

23.    Until Patient's MOOP was met, Medical Provider was informed that Medical Provider would be paid for medical services, at eighty (80) percent of the UCR rate. Once the MOOP was met payment would be made at 100% of the UCR rate.

24.    Medical Provider was informed that there was no max daily payment amount.

25.    All of the information obtained was documented by Medical Provider as part of Medical Provider's written, office policy and practice.

26.    At no time prior to the provision of services to Patient by Medical Provider, on May 1, 2019 or otherwise, was Medical Provider advised that Patient's policy or certificate of

---

[3] United Healthcare, Information on Payment of Out-of-Network Benefits (March 6, 2018), *https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits.*

Complaint

1    insurance was subject to certain exclusions, limitations or qualifications, which might result in
2    denial of coverage, limitation of payment or any other method of payment unrelated to UCR.

3          27.     DEFENDANT did not make reference to any other portion of Patient's plan that
4    would put Medical Provider on notice of any reduction in the originally stated payment
5    percentage.

6          28.     Medical Provider was never provided with a copy of Patient's plan by the
7    DEFENDANT or Patient. As a result, Medical Provider could not even make itself aware of any
8    reduction of the payment amount.

9          29.     Additionally, before providing services, but once Medical Provider was informed
10   that the offered payment rate was UCR, Medical Provider referred to the Fair Health data, the
11   same data utilized by DEFENDANT and its agents, to determine the amount Medical Provider
12   could expect to be paid by DEFENDANT.

13         30.     Medical Provider relied and provided services solely based on DEFENDANT's
14   statements including its statement that it would make payment at the UCR rate. Statements which
15   had no relation to DEFENDANT and Patient's plan document, as the statements may or may not
16   have been based in DEFENDANT or Patient's plan documents, but that bore no consideration
17   when Medical Provider agreed to provide facilities for the performance of the procedure. Medical
18   Provider took DEFENDANT at its word and provided the facility for the procedures based solely
19   on that information.

20         31.     Following the procedure, Medical Provider submitted its claims to DEFENDANT
21   accompanied with lengthy operative reports, chart notes, and other medical records.  No matter
22   whether large or small, all of Medical Provider's claims were submitted to DEFENDANT using
23   CPT codes, Healthcare Common Procedure Coding System ("HCPCS"), and modifiers, as
24   necessary. Medical Provider submitted to DEFENDANT any and all billing information and any
25   and all additional information requested by DEFENDANT.

26         32.     DEFENDANT then processed Medical Provider's bill of $56,668.25 and sent a
27   total payment amount of $1,397.93 far below the UCR value of the services and far below the
28   agreed upon contract.

33.     Following DEFENDANT's incredibly non-payment, Medical Provider sent DEFENDANT a number of letters requesting proper payment.

34.     Medical Provider was and now HAMOC is entitled to a full payment from DEFENDANT according to the terms offered by DEFENDANT.

**PATIENT AJ**

35.     On July 8, 2019, Patient received surgical procedures using Medical Provider's facility.

36.     On June 20, 2019, for each respective procedure, Medical Provider's employee, Yuriko H., obtained promises and information from DEFEDANT's representatives, Maric, to be assured that DEFENDANT would pay for the facilities to be provided to Patient and under what terms that payment would be made.

37.     Medical Provider was informed that Patient's deductible is and was $4,000.00 and that Patient's Max Out Of Pocket ("MOOP") expense is and was $8,000.00 and that to date for that calendar year Patient had paid $0.00.

38.     Until Patient's MOOP was met, Medical Provider was informed that Medical Provider would be paid for medical services, at eighty (80) percent of the UCR rate. Once the MOOP was met payment would be made at 100% of the UCR rate.

39.     Medical Provider was informed that there was no max daily payment amount.

40.     All of the information obtained was documented by Medical Provider as part of Medical Provider's written, office policy and practice.

41.     At no time prior to the provision of services to Patient by Medical Provider, on June 20, 2019 or otherwise, was Medical Provider advised that Patient's policy or certificate of insurance was subject to certain exclusions, limitations or qualifications, which might result in denial of coverage, limitation of payment or any other method of payment unrelated to UCR.

42.     DEFENDANT did not make reference to any other portion of Patient's plan that would put Medical Provider on notice of any reduction in the originally stated payment percentage.

- 8 -
Complaint

43.     Medical Provider was never provided with a copy of Patient's plan by the DEFENDANT or Patient. As a result, Medical Provider could not even make itself aware of any reduction of the payment amount.

44.     Additionally, before providing services, but once Medical Provider was informed that the offered payment rate was UCR, Medical Provider referred to the Fair Health data, the same data utilized by DEFENDANT and its agents, to determine the amount Medical Provider could expect to be paid by DEFENDANT.

45.     Medical Provider relied and provided services solely based on DEFENDANT's statements including its statement that it would make payment at the UCR rate. Statements which had no relation to DEFENDANT and Patient's plan document, as the statements may or may not have been based in DEFENDANT or Patient's plan documents, but that bore no consideration when Medical Provider agreed to provide facilities for the performance of the procedure. Medical Provider took DEFENDANT at its word and provided the facility for the procedures based solely on that information.

46.     Following the procedure, Medical Provider submitted its claims to DEFENDANT accompanied with lengthy operative reports, chart notes, and other medical records. No matter whether large or small, all of Medical Provider's claims were submitted to DEFENDANT using CPT codes, HCPCS, and modifiers, as necessary. Medical Provider submitted to DEFENDANT any and all billing information and any and all additional information requested by DEFENDANT.

47.     DEFENDANT then processed Medical Provider's bill of $113,745.00 and sent a total payment amount of $3,572.78far below the UCR value of the services and far below the agreed upon contract.

48.     Following DEFENDANT's incredibly non-payment, Medical Provider sent DEFENDANT a number of letters requesting proper payment.

49.     Medical Provider was and now HAMOC is entitled to a full payment from DEFENDANT according to the terms offered by DEFENDANT.

## **FIRST CAUSE OF ACTION:**

### **FOR BREACH OF ORAL CONTRACT**

50.     HAMOC incorporates by reference all previous paragraphs alleged in this complaint as though fully set forth herein.

51.     At all relevant times, an oral agreement and contract was in full force and effect between Medical Provider and DEFENDANT and DOES 1 through 10, inclusive, and each of them, whereby DEFENDANT and DOES 1 through 10, inclusive warranted, guaranteed, promised, pledged and agreed to pay, and indemnify Medical Provider, for all services rendered to Patients at the rate of UCR. In reliance upon such agreement and contract, Medical Provider accepted Patients for treatment and provided facilities to initiate, administer and render surgeries and other medical services upon Patients, at great cost to itself.

52.     Pursuant to the terms of the oral agreement, DEFENDANT and DOES 1 through 10, inclusive, and each of them, agreed to pay their portion of the full cost of the facilities at a rate of UCR.

53.     Medical Provider has performed and satisfied all obligations and conditions precedent required on its part to be performed pursuant to the oral agreement. Specifically, Medical Provider contacted DEFENDANT and/or their agents, and each of them, in order to obtain certification and authorization, submitted claims, invoices for services and other documentation to allow the adjustment and payment of claims by DEFENDANT and each of them, and rendered care and treatment to Patients, pursuant to the terms of the subject oral agreements. DEFENDANT, and each of them, did certify, authorize and request the provision and rendition of medical services by Medical Provider to Patients and, by their representations, urged Medical Provider to proceed with and continue the care and treatment of Patients.

54.     DEFENDANT have failed and refused to pay Medical Provider and now HAMOC for the full agreed cost of the medical facilities which were provided to the Patients by Medical Provider. In denying payment for the full charges incurred by the Patients, defendants, and each of them, have breached their obligations as set forth in the subject oral agreement.

- 10 -

Complaint

55.     As an actual, legal and proximate result of the aforementioned conduct of defendants, and each of them, HAMOC has suffered, and will continue to suffer in the future, damages under the oral agreement, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

### SECOND CAUSE OF ACTION
### FOR PROMISSORY ESTOPPEL

56.     HAMOC incorporates by reference all previous paragraphs as though fully set forth herein.

57.     DEFENDANT promised and asserted that the procedure to be performed and which was performed for and on the Patients was covered, authorized, certified and would be paid for at the rate of UCR.

58.     Medical Provider only decided to provide services because they were assured that Medicare was not part of the calculation of payment and that Medical Provider would be paid at the UCR rate.

59.     After assuring and promising Medical Provider that payment would be at the UCR rate, DEFENDANT should have reasonably expected that Medical Provider would then go on to provide the facility for the performance of the procedure on the Patients expecting that payment would be made at that rate.

60.     As a direct and proximate result of DEFENDANT's misrepresentations, Medical Provider has been damaged in an amount equal to the amount of money Medical Provider should have received had DEFENDANT paid the cost of the procedures at the UCR rate.

61.     The detriment suffered by Medical Provider is the amount required to make Medical Provider whole, for the time, cost and money expended in providing the facilities to Patients.  As a further direct, legal and proximate result of Medical Provider's detrimental reliance on the misrepresentations of defendants, and each of them, Medical Provider has been damaged due to the loss of monies expended in providing said facility for which it was significantly underpaid and has suffered damages in the loss of use of the proceeds and income to be derived from the facility to which HAMOC is now entitled.

11
Complaint

62.     In light of the material representations and misrepresentations of DEFENDANT made to Medical Provider, and of Medical Provider's reliance on DEFENDANT's representations, and based upon Medical Provider's detrimental reliance thereon, DEFENDANT, and each of them, are estopped from denying payment and indemnification for Patients' treatments at the UCR rate and HAMOC is now entitled to the value enumerated by that calculation. An amount to be determined at the time of trial.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 12 -

Complaint

### PRAYER FOR RELIEF

**WHEREFORE,** HEALTHCARE ALLY MANAGEMENT OF CALIFORNIA, LLC prays for judgment against defendants as follows:

1.     For compensatory damages in an amount to be determined, plus statutory interest;

2.     For restitution in an amount to be determined, plus statutory interest;

3.     For a declaration that DEFENDANT is obligated to pay HAMOC all monies owed for services rendered to the Patients; and

4.     For such other relief as the Court deems just and appropriate

Dated: September 6, 2020          LAW OFFICES OF JONATHAN A. STIEGLITZ

By: _____
JONATHAN A. STIEGLITZ
Attorneys for:
HEALTHCARE ALLY MANAGEMENT OF
CALIFORNIA, LLC

### DEMAND FOR JURY TRIAL

HAMOC, HEALTHCARE ALLY MANAGEMENT OF CALIFORNIA, LLC hereby demands a jury trial as provided by law.

Dated: September 6, 2020          LAW OFFICES OF JONATHAN A. STIEGLITZ

By: _____
JONATHAN A. STIEGLITZ
Attorneys for:
HEALTHCARE ALLY MANAGEMENT OF
CALIFORNIA, LLC

- 13 -
Complaint